## THE ELLA PIERCE THURLOW.

### DRISKO v. BARBER S. S. LINES, Inc.

### BARBER S. S. LINES, Inc., v. ATLANTIC COAST CO.

(District Court, S. D. New York. August 29, 1921.)

1. **Shipping** ⬦⟾53—**Under charter not restricting cargo, vessel held liable as common carrier on bills of lading.**

   Where vessel was chartered without restriction as to whose goods should be carried, and charterer's agent, on master's direction, issued bills of lading with which charterer had no connection, vessel was liable as common carrier thereon.

2. **Shipping** ⬦⟾126—**Unloading onto dock held not delivery to consignees so as to end ship's liability.**

   Where master did not notify consignees to accept delivery from ship's deck, he waived requirement in making arrangements with charterer's agent to handle unloading, and, in view of custom of port to deliver from dock, unloading onto dock was not delivery to consignees so as to end ship's liability for failing to make full delivery, and charterer's failure to keep tally of unloading did not affect its claim.

3. **Shipping** ⬦⟾106—**Presumed quantity specified in bills of lading was actually received.**

   In absence of rebutting testimony, bills of lading raise presumption that quantity therein specified was actually received by ship.

4. **Shipping** ⬦⟾53—**Charterer's liability as unloading and delivery agent held merely to exercise due care.**

   Where ship is liable as common carrier, charterer's liability to ship as unloading and delivery agent is merely to exercise due care.

In Admiralty. Libel by Ralph B. Drisko, master of the schooner Ella Pierce Thurlow, against the Barber Steamship Lines, Inc., with cross-libel by the Barber Steamship Lines, Inc., against the schooner Ella Pierce Thurlow and the Atlantic Coast Company. Decree for libelee and cross-libelant.

Decree affirmed 300 Fed. 106.

MacFarland, Taylor & Costello, of New York City (Willard U. Taylor and Morris Cooper, Jr., both of New York City, of counsel), for libelant.

Hunt, Hill & Betts, of New York City (Robert McLeod Jackson, of New York City, of counsel), for Barber S. S. Lines, Inc., respondent and cross-libelant.

MACK, Circuit Judge. The schooner Ella Pierce Thurlow was chartered for a lump sum to respondent for one voyage from Buenos Aires to New York, for a complete cargo of merchandise. Freight was payable one-half on signing of the bills of lading in Buenos Aires and the balance "on proper delivery of cargo at the port of discharge." The libel is for an unpaid balance due for freight.

The vessel was "to be consigned to charterers or their agents under this charter, but to be free of any consignment commission."

On arrival at Buenos Aires the master reported at once to the charterer and arranged with its general agent to handle the schooner the

same as their own steamships. Accordingly, the stevedore of the Barber Steamship Lines took full charge of the loading; the mate of the schooner giving receipts on the basis of the tally men's figures.

The vessel was fully loaded with canned corned beef of several sizes for two consignees, Libby, McNeill & Libby, and Armour & Co. The loss claimed on the cross-libel is a short delivery of 138 large-size cases (the claim in fact is for 139 cases, but it is conceded that one case was lost overboard in unloading), 129 of Libby's and 9 of Armour's.

Consignees have made claim upon cross-libelant for the value of the shortage, and it in turn made claim against the owners of the schooner, to be indemnified therefor.

It bases its cross-libel both on the obligation of the schooner and her owners to indemnify the charterer, and as to 129 cases, on payment by it of the claim of and an assignment thereof by Libby, McNeill & Libby.

The cross-libelant also makes claim for certain owner's disbursements paid by it for the schooner's account in Buenos Aires, the vouchers for which have been lost or mislaid. Leave has been given to make proof thereof before the commissioner, if the parties fail to agree thereon.

The bill of lading provides:

"That the goods are to be delivered from the ship's deck (where the ship-owner's responsibility shall cease)."

The master testified as follows:

"Q. What was done with reference to the unloading? A. The Barber Line took charge of the ship and unloaded her.

"Q. Their stevedore? A. They have their own men over here; I don't know what they call them.

"Q. They came on board and proceeded to unload the vessel without any instructions or directions from yourself? A. Well, I took the ship to the dock and turned it over to them.

"Q. Then they came on board and unloaded the vessel? A. Yes.

"Q. Did they keep tally? A. I asked Mr. Barthol of the Barber Line to furnish the checkers and check the cargo out, which they did.

"Q. What did he say? A. Said he would do that and handle it just the same, as I wanted it handled just the same as they do steamers on the line."

The practice of cross-libelant and of other lines in this port is not to tally over the rail goods which are landed on the dock, but to leave them on the dock and to take the tally as they are delivered to the consignees.

The vessel had docked at the cross-libelant's pier, No. 36, Atlantic Basin, Brooklyn, on October 15, 1918; commenced discharging on the same day, finished discharging on October 22d, and left the pier on October 23d. Delivery of the cargo to the consignees was commenced on October 15th and was finished on October 26th. The master went home after arranging with cross-libelant for unloading and did not return until October 26th, when he was informed that in tallying the cargo from the ship, the cargo had not been all checked and that it was necessary to check the goods when delivered to consignees. Eventually it was reported to the captain by the representatives of the Barber Line that the vessel had turned out short 139 cases of the largest size.

All of Libby's goods were taken away by lighters; part of them were loaded directly over the rail of the schooner and part from the dock.

Armour's goods were taken away from the dock partly by lighter and partly by trucks.

All goods which were loaded upon lighters, whether from the ship or dock or upon trucks from the docks, were properly tallied. A tally over the rail of the schooner was also undertaken of the goods which were originally put on the dock, but a number of the slips for this tally have been lost.

[1]. 1. In my judgment, the vessel was and was acting as a common carrier in issuing the bills of lading. She was chartered to cross-libelant not to carry its own goods but without limitation. Its agent, but on behalf and by direction of the master, issued six bills of lading to two consignees with whom, so far as shown, cross-libelant was not connected. The charter party in no manner restricted the charterer from soliciting cargo from any person.

[2] 2. The master at no time directed that consignees be notified to accept delivery from the ship's deck, as he might have done under the provisions of the bill of lading; in making his arrangements with cross-libelant, he waived this requirement; for, as above stated, cross-libelant's own practice, as well as the customary one at this port, was to deliver from the dock. Therefore unloading onto the dock did not constitute a delivery to the consignees or end the ship's liability as carrier, and the failure to keep a tally of the unloading from the ship to the dock, or to establish therefrom a shortage at the time of such unloading, or the fact that on the unsealing of the hatches the condition was the same, with the exception of one case, as at the time of sealing in Buenos Aires, is not fatal to cross-libelant's claim. The Titania, 131 Fed. 229, 65 C. C. A. 215.

In my judgment, without detailing the testimony, it has proven by a preponderance of the evidence, both a shortage of 138 cases in the delivery from the dock to the consignees' lighters or trucks, despite some inaccuracies and discrepancies, and the loss of certain tally sheets, and also a delivery of all goods unloaded on the dock. Therefore the ship is liable to the consignees and to the charterer, both as assignee and as party to be indemnified, for failure to make full delivery. The clauses in the bill of lading limiting the time for asserting claims for damages to the goods are clearly inapplicable to a claim of nondelivery.

[3] 3. Cross-libelant need not prove how the loss arose. In the absence of rebutting testimony—and there was none—the bills of lading raise a presumption that the quantity therein specified was actually received by the ship.

Therefore on proof of failure to deliver without its fault, cross-libelant has established its case. Smith & Co. v. Navigation Co., 1896 A. C. 70.

[4] 4. Assuming, though not conceding, that the evidence makes it more probable that in some unexplained manner the goods were lost or stolen from the dock in New York after unloading, rather than from the ship either during the voyage or at Buenos Aires after they had been

tallied in, the ship would, nevertheless, be liable; for while the ship's liability is that of a common carrier, cross-libelant's liability to the ship as unloading and delivery agent is only for the exercise of due care. And it is not proven, or indeed contended, that it failed in its duty in that respect.