## BALTIMORE S. S. CO., Inc., v. KOPPEL INDUSTRIAL CAR & EQUIPMENT CO.

(Circuit Court of Appeals, Fourth Circuit. May 6, 1924.)

No. 2201.

1. Admiralty ⬤➡118—Appeal from dismissal of cross-libel does not open decree on original libel for review.

An appeal from dismissal of a cross-libel opens the cause for review of all issues arising on the cross-libel, but not that part of the decree dismissing the original libel, where libelant has not appealed, though the libel and cross-libel were consolidated for convenience of trial.

2. Shipping ⬤➡142—Provision in bill of lading limiting time for bringing suit for damage to cargo held valid.

Provision in a bill of lading requiring suit for damage to cargo to be brought within three months after notice of loss or damage *held* reasonable and valid.

3. Shipping ⬤➡126—Carrier held to have assumed risk of delay in landing cargo.

A contract of a carrier to transport goods to a foreign port and there land them, after which they are to be received by the consignee, imports no obligation on the part of the owner to aid in the landing, and the carrier assumes all risk of loss to itself from detention for lack of room or facilities for discharging.

4. Shipping ⬤➡126—Delay in discharging held at charge of carrier.

Where a carrier contracted to land the cargo in a foreign port before the consignee was required to accept it, and it could have been discharged on the custom house wharf or a bonded wharf without payment of duty, the consignee could not be required to pay the duty in advance of discharge to enable the ship to discharge at an unbonded wharf, and is not liable for delay before discharge could be made at a bonded wharf.

Appeal from the District Court of the United States for the District of Maryland. at Baltimore; John C. Rose and Morris A. Soper, Judges.

⬤➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Suit in admiralty by the Koppel Industrial Car & Equipment Company, against the Baltimore Steamship Company, Inc., with cross-libel. Decree dismissing both libel and cross-libel, and cross-libelant appeals. Affirmed.

For opinion below, see 287 Fed. 203.

George Forbes and John Phelps, both of Baltimore, Md., for appellant.

Robert S. Erskine, of New York City (Robert W. Williams, of Baltimore, Md., Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City, and Janney, Ober, Slingluff & Williams, of Baltimore, Md., on the brief), for appellee.

Before WOODS and WADDILL, Circuit Judges, and WATKINS, District Judge.

WOODS, Circuit Judge. In October, 1920, Baltimore Steamship Company, Inc., issued its bills of lading to Koppel Industrial Car & Equipment Company for the parts of 50 steel gondola cars, to be carried from Baltimore, Md., to Matanzas, Cuba, on the steamships Lake Galata and Lake Ontario, and there delivered to the order of consignor. The bills of lading contained these provisions:

"Section 11. The steamer may commence discharging immediately on arrival and discharge continuously, any custom of the port to the contrary notwithstanding, the collector of the port being hereby authorized to grant a general order for discharge immediately on arrival, and if the goods be not taken from the steamer by the consignee directly they come to hand in discharging the steamer, the master or steamer's agent to be at liberty to enter and land the goods, or put them into craft or store at the owner's risk and expense, when the goods shall be deemed delivered and the steamer's responsibility ended, but the steamer and carrier to have a lien on such goods until the payment of all costs and charges so incurred."

"Section 22. Cargo may be discharged into transit sheds or otherwise immediately after the arrival of the steamer. Consignee to enter the goods at the custom house within twenty-four hours after the steamer is reported there, accepting delivery and removing same immediately after being landed, otherwise, duty may be paid and/or the goods warehoused, in bond or otherwise, by the agent of the steamer, at the expense and risk of the consignee. Porterage of the delivery of the cargo, to be done by consignees of the steamer, at their tariff rates, at the expense and risk of the receivers of the goods. Tonnage and shed dues payable by the consignee of the goods. * * * *"

Koppel Company shipped the cars on the faith of a contract for their purchase by one Lezama, a resident of Cuba, in which Lezama agreed to pay Cuban import duties. The vessels arrived in the port of Matanzas on the 24th and 26th November, 1920. Lezama became insolvent, and failed to pay the duty or to take the cars under his original contract. The ships completed the unloading of other goods stored above the cars about December 15, 1920. Between January 26 and 31, 1921, they discharged the cars on the government wharf. On September 23, 1921, Koppel Company filed its libel against Baltimore Steamship Company, alleging negligent handling and negligent placing of the cars in an improper and exposed place, and damages of $20,000 resulting therefrom. On May 1, 1922, the steamship company answered, and at the same time filed its cross-libel, alleging that by reason of the failure of the Koppel Company—

"to pay or arrange for the payment of the custom duties on the said ship-ments, the cross-libelant was prevented from unloading and discharging said goods, and wrongfully detained at the port of Matanzas, Cuba, from the date of the respective arrivals of its said ships, at Matanzas, until the date at which discharge was actually begun, to wit: The Lake Ontario was delayed from November 24, 1920, to January 22, 1921, or 58 days; the Lake Galata, from November 28, 1920, to January 22, 1921, or 53 days."

Loss of $108,900.96 was claimed as due for the detention. On June 30, 1922, Koppel Company amended the original libel, by set-ting up the wrongful and negligent failure of the steamship company to discharge the cars within a reasonable period, and claiming damages in the aggregate of $160,700. The cases were consolidated, and on the testimony taken in court and by deposition the District Judge dis-missed both libels.

[1] The steamship company appealed. Although the Koppel Com-pany did not appeal, nor file assignments of error, it insists that the ap-peal of the steamship company opens both the libel and cross-libel cases for a new trial on all the issues. The appeal of the steamship com-pany in its cross-libel opens that cause to new trial of all the issues in that case. Irvine v. The Hesper, 122 U. S. 256, 266, 7 Sup. Ct. 1177, 30 L. Ed. 1175; Reid v. American Express Co., 241 U. S. 544, 548, 36 Sup. Ct. 712, 60 L. Ed. 1156.

[2] But the consolidation for convenience of trial did not merge the two causes of action. It did not deprive either party of any right or relieve it of any burden incident to the libel or cross-libel as a sepa-rate proceeding. Mutual Life Insurance Co. v. Hillmon, 145 U. S. 285, 293, 12 Sup. Ct. 909, 36 L. Ed. 706; Rich et al. v. Lambert et al., 12 How. 347, 352, 13 L. Ed. 1017. Neither party having appealed from the decree dismissing the libel of Koppel Company, it is not re-viewable here. But, if this were not so, the bill of lading provided that no suit to recover for loss or damage should in any event be main-tained against the carrier, unless instituted within three months after the filing of written notice of loss or damage. It is fatal that the libel was not filed until the expiration of nearly four months after notice of the claim.

The cross-libel of Baltimore Steamship Company for damages for detention of the ships rests upon the assertion that it was the duty of Koppel Company to pay or arrange for the payment of the duty on the cars, that Koppel Company failed and refused to do so, and that for this reason the ships were unable to discharge the cars.

[3] The contract of the steamship company was to transport the goods to the port of Matanzas, and there land them at a suitable wharf, according to the law of the country of destination and the cus-tom and usage of the port. The Eddy, 5 Wall. 481, 495, 18 L. Ed. 486; Constable v. National Steamship Co., 154 U. S. 51, 63, 14 Sup. Ct. 1062, 38 L. Ed. 903; The Titania, 131 Fed. 229, 65 C. C. A. 215. The contract imports no obligation on the part of the owner of the cars to aid in this service. Section 22 of the bill of lading, above quot-ed, expresses that the consignee is to receive the goods after the ship has landed them. It follows that, when the steamship company under-took the carriage and delivery of the goods in the port of Matanzas,

it assumed all the risks of loss to itself from detention for lack of room or facilities at the wharves where it was authorized to discharge and deliver the cars.

[4] The custom house regulations provided:

"Article 67 No merchandise of any kind whatsoever can be legally introduced into the Island of Cuba without passing through the custom house duly established for this purpose, all such merchandise requiring to be presented at the custom house for examination and payment of customs duties, if to such it is liable."

"Article 115. The unloading of a ship shall be permitted by the collector after said ship has made its proper entry in the custom house. The cargo for immediate delivery can be unloaded at once, after permission to unload has been granted, on the wharves and in the warehouses that may be designated by the collector for that purpose."

The wharves designated for the landing of goods were the custom house wharf and bonded private wharves. It is not denied by the steamship company that on these wharves goods could be discharged before payment of duty. The failure of the consignee to enter the goods did not prevent the discharge or cause the detention of the ships. On the part of the steamship company there was evidence to the effect that the custom wharf was crowded and lacked facilities to unload heavy freight like the cars, and that the only bonded warehouse was that of the Munson Line, which refused to allow the ships to unload there. If that were all, it is evident the steamship company would have no ground under its contract of carriage and delivery to demand that the Koppel Company, as consignor, should pay any part of its damages for detention, due to its inability to find room and facilities at an authorized wharf.

The pivotal contention of the steamship company, however, is that, when the masters of the vessels found the custom house wharf and bonded wharves unavailable, the shipper, as consignee, owed the ships the duty of arranging tariff charges in advance of the discharge of the cars, so that they could be unloaded and delivered on the Bea unbonded wharf, which had room and appliances for discharge. On December 14, 1920, Bea & Cia., agents for the steamship company, wrote to Koppel Company, informing it of the congestion at the custom wharf, and suggesting that the discharge could be accomplished by making "quedan" in the custom house. According to the testimony on the part of the steamship company, "quedan" meant a custom of the port which allowed the consignee of goods to have them unloaded on an unbonded wharf by "presenting the original shipping documents accompanied by a descriptive sheet, and when examined and accepted, by making a deposit of custom duties, plus 25 per cent." According to the testimony on behalf of Koppel Company, the custom of "quedan" extended only to permission to the owner to remove the goods from the custom wharf or some other wharf designated by the collector, and the goods could be landed on such designated wharf without the payment or security   It is not necessary to decide between the conflicting definitions of "quedan." The twenty-second section of the bill of lading issued by the ships necessarily implies that the customs duty should be paid by the consignee after discharge and

delivery, and the steamship company cannot impose upon Koppel Company the burden of compliance with a custom contrary to its contract of carriage. The steamship company must bear its own contract burden of risk of detention from the crowded condition of the harbor and of the authorized wharves. Moore v. United States, 196 U. S. 157, 166, 25 Sup. Ct. 202, 49 L. Ed. 428.

On conflicting testimony the District Court concluded that the steamship company could have discharged the cars without material ·delay if it had made proper effort. This conclusion is strongly supported by the fact that, when the representatives of the Shipping Board, owner of the ships, came to Cuba and stated the condition of the ships to the Cuban authorities, arrangements for unloading on the custom wharf were made; that, too, at a time when there was no material change of conditions. We think this finding of the District Court is supported by the weight of the evidence. Indeed, careful reading of the record and the able and elaborate briefs leads us to the conclusion that there was inexcusable lack of effort on the part of the steamship company to get the ships away. Equally clear it is that Koppel Company made no effort to facilitate the discharge of the cars, because it was hoping that Lezama, who had contracted to buy the cars and pay the duty, would eventually do so. But, as we have tried to show, Koppel Company did not fail to discharge any legal obligation, and therefore was not responsible for the detention of the ships.

Koppel Company submitted the additional defense that the steamship company could not recover, because it was merely the operating agents of the Shipping Board, the real owner of the ships. It is not necessary to decide this point, since we have concluded that the steamship company was not entitled to recover on the merits.

Affirmed.

⊕⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes